Arthur BRAWN and Gloria
Brawn, Plaintiffs,

v.

FUJI HEAVY INDUSTRIES, LTD.
and Subaru of America, Inc.,
Defendants.

Civ. No. 91-296-P-H.

United States District Court,
D. Maine.

Feb. 12, 1993.

Robert J. Stolt, David M. Lipman, Peter B. Bickerman, Lipman & Katz, P.A., Augusta, ME, for plaintiffs.

Robert H. Stier, Jr., Neal F. Pratt, Kenneth D. Pierce, Bernstein, Shur, Sawyer & Nelson, Portland, ME, for defendants.

## ORDER ON PLAINTIFFS' MOTION TO EXCLUDE POST–DEPOSITION TESTING BY DR. PERL

HORNBY, District Judge.

Following the close of discovery, the defendants commissioned their expert, Dr. Perl, to do further testing. The plaintiffs have moved to preclude use of these new tests and any testimony based upon them.

Because the trial had been significantly delayed, I did not automatically exclude the new testing on grounds of lateness or prejudice because I concluded that there was adequate opportunity for the plaintiffs to take Dr. Perl's deposition and prepare to deal with it at trial. Accordingly, the plaintiffs took a further deposition of Dr. Perl and received videotapes and still photographs of his tests. They have now renewed their motion to exclude the tests, the test results and any testimony concerning them. On February 8, 1993, I held a hearing on this issue pursuant to Fed.R.Evid. 104. For that purpose, I received and viewed a videotape of the tests, the still photographs and the supplemental deposition of Dr. Perl taken on January 19, 1993. I now make the following rulings.

### STATIC TEST

In apparent response to the plaintiffs' expert Dr. Newman's suggestion that two measures would have strengthened the Subaru XT roof header, specifically front and rear welding and a greater thickness of steel (60/1000 gauge rolled steel, boxed cell), Dr. Perl undertook to perform a static test evaluating this proposal. He did not use an actual

header from a Subaru or any other car. Instead, he selected a piece of metal of the same gauge as is used in the Subaru XT header and a piece of metal of the gauge approved by Dr. Newman and established his own apparatus. The apparatus does not reflect the actual shape of the Subaru header. Dr. Perl then used pulleys to exert a force pulling the regular pieces of steel backward and down, presumably in his projected version of the forces that might have been at work in the Brawns' accident. He applied the same procedure to the thicker piece of steel as recommended by Dr. Newman with the front and rear welding. He concluded that, although there was an initial difference in the strength of the two pieces of metal, that difference became insignificant as the load increased because other elements of the roof structure then became involved.

The defendants have furnished no evidence that the device used by Dr. Perl to perform this so-called test is a generally accepted engineering device or that the procedures he used are generally accepted engineering procedures. The pieces of metal admittedly do not simulate the roof structure and there is no testimony that these tests show how the two different devices, if implemented in a car like a Subaru, would perform. Indeed, Dr. Perl said that he could not say what would happen in an impact. Dr. Perl admitted that this was an original design on his part and an original test, following no models or protocols, and that it had not been submitted to any peer review or any other engineers for their assessment of its capacity. In short, I am confronted with a last minute test performed after the close of the discovery period that does not reflect, according to the evidence, any standard procedures used by the engineering community and cannot be tied to the performance of the roof header in its original design or the proposed amendments. I conclude under Rules 701, 702 and 403 that the use of this test and any testimony concerning it would unduly risk confusing or misleading the jury and would not be of assistance to the finder of fact.

### SIMULATED MOOSE CRASH

Dr. Perl also devised a dummy moose. He based its design and construction on studies that were conducted in Sweden. Basically the dummy moose is constructed of polyurethane tubes that hold water and an absorbent material to reduce any hydraulic effect from the movement of the water. Dr. Perl then selected a height at which to hoist this "moose" above ground and had a Subaru of the same model and year driven into it at a speed of approximately 10 miles per hour to determine what would happen. The moose dummy hit the windshield and rolled partway up, but apparently did not have a major impact on the header, unlike the Brawns' moose accident.

There are obviously a number of questions about this test and how it correlates to what took place in the Brawns' accident. I conclude, however, that these issues are properly for the jury in determining what did take place in that accident. In essence, this is an attempt at accident reconstruction to contradict one of the plaintiffs' versions of what took place. It will be up to the jury, of course, to decide the nature of the moose that hit the Brawns' vehicle—for example, how far above the ground its belly was slung; how much it weighed; how far apart its feet were; whether it was stationary as the Brawns' hit it or was moving or jumping; precisely how they hit it, whether colliding first with its legs or driving between its legs; etc. Likewise, the jury will have to determine the speed of the Brawns' car at impact and whether it was being braked in a significant fashion that would lower the front end or alter the location of Mrs. Brawn's head within the passenger compartment. Only a very limited set of answers to these questions will correlate with Dr. Perl's dummy moose demonstration. If the jury should select that limited set, however, then the Dr. Perl dummy moose demonstration is legitimate evidence to demonstrate to the jury what might or might not have happened in the Brawns' collision. It is, of course, open to the plaintiffs through their lawyers to attempt to persuade the jury that nothing close to Dr. Perl's simulation in fact took place and that his simulation should therefore be ignored. But those are all questions for the factfinder and for argument. I conclude, therefore, that this test is properly admissible under

the Rules of Evidence and, for the reasons that I expressed at an earlier hearing, that there is no prejudice in permitting the test to be done at a late date.

The plaintiffs have also complained that, when they finally visited Dr. Perl to conduct the deposition, the actual dummy was frozen to the floor in an outdoor location. They were furnished with a representative segment, however, and nothing has prevented them from testing or evaluating the nature of the construction as it has been described to them. Accordingly, assuming that a proper foundation is laid at trial, I will permit introduction into evidence of the dummy moose test and testimony concerning it.